# EXHIBIT A

# PURCHASE AGREEMENT

See attached.

## REAL ESTATE PURCHASE AND SALE AGREEMENT

**THIS AGREEMENT**, made this 30th day of November, 2016, by and among **Equity Acquisitions-Trademark, LLC**, a South Carolina limited liability company (the "Seller"), **CEDAR GROVE SC III, LLC**, a _____ limited liability company (the "Purchaser"), and **MADISON TITLE AGENCY**, a New Jersey corporation  (the "Escrow Agent").

### R E C I T A L S

 Seller desires to sell all right, title and interest to (i) an approximately **96** unit apartment complex known as **The Residences at Haywood** located at **48 McPrice Court Greenville, SC 29615** and more fully described in Exhibit "A" attached hereto ("**The Residences at Haywood**") and (Identified herein as the "Property") to Purchaser, and Purchaser desires to purchase the Property from Seller.  The Property is more particularly described on Exhibit "A" attached hereto and made a part hereof, and includes all improvements located thereon and all easements and appurtenances thereunto belonging, including any right, title and interest of the Seller in and to adjacent streets, alleys, rights-of-way, permits, zoning and land use approvals, and all development rights affecting, benefiting or burdening the Property.

Seller is the contract purchaser of the Property from **Equity Acquisitions-Trademark, LLC**, a **South Carolina** limited liability company, pursuant to that certain Real Estate Purchase and Sale Agreement dated contemporaneously herewith (the "Underlying Contract").  All of the Seller's obligations hereunder are expressly contingent upon the acquisition of the Property in accordance with the terms of the Underlying Contract.  Seller shall use its commercially reasonable best efforts to acquire the Property prior to the Closing contemplated by this Agreement.

### W I T N E S S E T H:

 NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, the parties hereto agree as follows:

1.    PURCHASE PRICE.  The Purchase Price ("Purchase Price") shall be **Five Million Seven Hundred Seventy Five Thousand Dollars ($5,775,000)**.  The Purchase Price shall be paid by Purchaser to Seller in cash at Closing.

2.    EARNEST MONEY.

A.    Payment of Earnest Money by Purchaser.  The Purchaser, on or before five (5)  business days after the final execution of this Agreement by the Seller, shall deliver to the Escrow

*Page 1 of 18*



Agent the Purchaser's check or wire transfer in the amount of **ONE HUNDRED THOUSAND AND NO/100TH DOLLARS ($100,000.00)** (the "Earnest Money"). Upon the expiration of the Inspection Period set forth in Paragraph 5(b) below, the Earnest Money shall be non-refundable to Purchaser except for the inability or failure of Seller to close the transaction contemplated herein, breach by Seller of its obligations hereunder, or as is otherwise expressly provided for herein.

B.    Application of Earnest Money.

1.    If Purchaser shall exercise any right or option under this Agreement to rescind, cancel or terminate this Agreement during the Inspection Period (as that term is defined in paragraph 5(B) hereof), then Escrow Agent, shall immediately refund the Earnest Money to Purchaser with no further action or demand required by Purchaser, less the sum of ONE HUNDRED AND NO/100TH DOLLARS ($100.00) which shall be paid to Seller in consideration for this Agreement, whereupon this Agreement shall terminate and the parties to this Agreement shall have no further rights, duties or obligations under this Agreement, except as otherwise specifically provided in this Agreement.

2.    At the Closing, Escrow Agent shall pay the Earnest Money to Seller and the Earnest Money shall be applied and credited in reduction of the Purchase Price.

C.    Deposit of Earnest Money. Escrow Agent shall deposit the Earnest Money in its lawyers trust account at a financial institution whose deposits are insured by the F.D.I.C. chosen by Escrow Agent.

3.    SURVEY. The Purchaser may, at its sole cost and expense, cause a South Carolina registered surveyor (herein referred to as the "Surveyor") to make a boundary survey (herein referred to as the "Survey") of the Property for the purpose of determining the exact number of acres within the boundary of the Property (to the nearest one thousandth (1/1000th) of an acre), the boundary lines of the Property, the location of all rights-of-way, buffers, easements and encroachments, if any, affecting the Property and any portion of the Property located within an area of special flood hazard as designated by the United States Department of Housing and Urban Development, the Federal Emergency Management Agency or any similar federal, state or local agency. Purchaser will deliver three (3) prints of the Survey, together with a written specification of any objections to the Survey, to Seller not later than the expiration of the Inspection Period, as hereinafter defined. Unless Seller objects to the Survey, the legal description of the Property from the Survey shall become a part of this Agreement without the necessity of any further action by any of the parties hereto and said description shall replace and supersede the description of the Property attached hereto as Exhibit "A" and "A-1".

4.    CONVEYANCE OF TITLE. The Seller shall convey good and marketable fee simple title to the Property to the Purchaser pursuant to recordable limited warranty deed. The Property shall be conveyed free and clear of all liens, encumbrances and other exceptions to title, except for (i) those title encumbrances and other exceptions which are approved



by Purchaser in the exercise of its sole discretion; and (ii) the lien for ad valorem taxes not yet due and payable (collectively the "Permitted Title Exceptions"). Not later than the end of the Inspection Period, the Purchaser shall deliver to the Seller a statement of any objections to the Seller's title (including the Permitted Title Exceptions) and the Seller shall have the right (but not the obligation) within a reasonable time thereafter in which to cure any such objections. Seller shall give Purchaser notice of its intent to cure or not cure any title objections within five (5) days after receipt by Seller of Purchaser's title objection notice; but if Seller does not give this notice within such five (5) day period, then Seller shall be deemed to elect not to cure any title objections. In the event that the Seller fails to cure any such objections, Purchaser may (i) terminate this Agreement and receive a refund of all Earnest Money, (ii) remove any such objections (but only as to monetary liens created, assumed or suffered by Seller against the Property) and pay the same at Closing from the Purchase Price in accordance with the amount of money due and payable for such monetary lien, or (iii) waive such objections and close the transaction contemplated by this Agreement in accordance with all of the terms and provisions hereof. At any time prior to the Closing Date, the Purchaser shall have the right to check down the title from and after the Effective Date of the preliminary title examination contemplated in this Paragraph 4 and deliver to the Seller a written statement of any objection which appears in the public records of ~~Spartanburg~~ County, South Carolina and affects title to the Property occurring subsequent to the preliminary title examination. The Seller shall have until the Closing Date to cure, at its expense, any such objection. In the event the Seller fails or refuses to cure such objection prior to the Closing Date, the Purchaser shall have the same rights with respect to such failure or refusal set forth in this Paragraph 4 as to preliminary title objections.

*[handwritten: Greenville]*

5.      RIGHT OF INSPECTION.

A.      General. The Seller agrees that, the Purchaser and its agents shall have the right and privilege of going upon the Property to inspect, examine and survey the Property, to plan for the development and use thereof. This right and privilege shall include all examinations and testing deemed necessary or appropriate by Purchaser in its sole discretion, including but not limited to the right to locate utilities, review any zoning conditions or requirements, review any protective or restrictive covenants, make soil tests, borings, percolation tests and all such other inspections, examinations and tests the Purchaser deems necessary to prepare for the development of the Property; provided, however that no grading shall be done and no trees or bushes shall be cut. Purchaser indemnifies and holds Seller harmless from and against loss or damage Seller may incur and any and all liens that may arise as a result of Purchaser's activities or the activities of Purchaser's agents, representatives or designees on the Property and against any and all claims for death or injury to persons or property arising out of or connected with Purchaser's (or its agents, representatives or designees) going upon the Property pursuant to the provisions of this Paragraph 5 or otherwise, and against all costs, expenses and liabilities occurring in or in connection with any such claim or proceeding brought thereon, including, without limitation, court costs and reasonable and actual attorney's fees. This indemnity shall survive the Closing or any termination of this Agreement. Purchaser shall, at Purchaser's expense, restore the Property to substantially the same condition existing at the Effective Date upon completion of inspection

*Page 3 of 18*



activities, but only to the extent any changes were caused by Purchaser, its representatives or designees.

Seller agrees to electronically provide Purchaser with the items listed on Exhibit "B" attached hereto and incorporated herein to the extent such items are within Seller's possession within three (3) business days of the date of this Agreement.

B.      Inspection Period. In the event the Purchaser determines, for any reason or for no reason, and in its sole and absolute discretion, that the Property is not acceptable for its intended use within thirty (30) days from the date Seller electronically delivers the full list of items listed on Exhibit "B" to Purchaser (the "Inspection Period"), the Purchaser shall have the exclusive right and option to terminate this Agreement and to receive a refund of the Earnest Money. During the Inspection Period, Purchaser will make such inspections as Purchaser deems necessary or appropriate to determine the feasibility of Purchaser's intended use of the Property. If Purchaser elects to terminate this Agreement during the Inspection Period, upon written request of Seller, Purchaser agrees to provide Seller with copies of all surveys, reports, tests, studies or any other documents or writings of any kind dealing with the Property which come into Purchaser's possession or control during the pendency of this Agreement, subject to the service provider's permission, if required.

      6.      CLOSING.

A.      General. The consummation of the purchase and sale described herein (the "Closing") is to occur on or before fifteen (15) days from the date of the end of the Inspection Period (the "Closing Date"). The Closing shall be held at such location and at a time and date which is mutually agreeable to Seller and Purchaser, or through an "escrow closing" or through the mail. At the Closing, the Seller shall execute and deliver to the Purchaser a limited warranty deed conveying good and marketable fee simple title to the Property free and clear of all liens and encumbrances except the Permitted Title Exceptions.

B.      Taxes. Real property ad valorem taxes assessed against the Property for the year in which the Closing occurs shall be prorated as of the Closing Date. In the event tax bills for the year in which the Closing occurs have not been issued at the time of the Closing, the proration shall be made on the basis of the taxes actually paid for the immediately preceding year. In the event the amount of such taxes is not finally determined at the date of Closing, an appropriate adjustment shall be made between Seller and Purchaser by payment of the difference, if any, when the actual amount of such taxes becomes known. If the Property is included within a larger parcel for taxing purposes, Seller agrees to cause the taxes to be paid on the real property of which the Property forms a part on or before the date such tax bills become delinquent. At the time that the tax bills are received for the year in which the Closing occurs (whether before or after the Closing), the Purchaser and the Seller shall make any adjustments made necessary by reason thereof.

C.      Documents. The Seller and the Purchaser agree that such documents as may be legally necessary or appropriate to carry out the terms of this Agreement shall be executed and

*Page 4 of 18*



delivered by each party to the other at the Closing, including, but not limited to, an affidavit from the Seller that has as its subject matter averments that, to the actual knowledge of the person signing the affidavit for Seller, (i) there are no rights or claims of parties in possession not shown by the public records, (ii) there are no liens or encumbrances other than those as to which specific provision is made at Closing, (iii) there are no liens, or rights to a lien, for services incurred by Seller (including, but not limited to, real estate brokerage services incurred by Seller), labor or material furnished at the request of Seller and not shown by the public records, (iv) the Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, and the Regulations thereunder, and (v) any other documents requested by the title company insuring the limited warranty deed.  The owner's affidavit to be executed by Seller at Closing shall expressly state that nothing contained therein shall in any way be deemed to modify or enlarge the other representations contained in this Agreement or the limited warranty of title which is to be contained in the deed of conveyance from Seller to Purchaser.  Seller shall also deliver at closing, an updated certified rent roll, which shall include any arrears and security deposits, a notice to tenants of the sale, an assignment of leases and any arrears and landlord/tenant proceedings, if any, all keys and access codes, original leases, to the extent in Seller's possession or copies thereof, all warranties and guaranties to the extent in Seller's possession.

D.    Expenses of Closing.  The Seller shall pay the cost of the State of South Carolina transfer tax and the documentary stamp taxes due on the conveyance of the Property and retroactive real estate taxes.  The Purchaser shall pay owner's title insurance premiums, and survey costs for which Purchaser is responsible under Paragraph 3, mortgage taxes, title examination costs, title certification costs, mortgagee title insurance premiums, any fees charged by the Escrow Agent, and any other costs incurred by the Purchaser.

7.    SELLER'S REPRESENTATIONS.

A.    The Seller makes the following representations, to the actual knowledge of the person signing this Agreement on behalf of Seller but without any independent investigation (provided, however, that the Seller affirmatively represents, without any qualification as to actual knowledge or independent investigation the correctness of items (ii), (iii), and (iv) below):

(i)    subject to the performance of all parties to the Underlying Contract, Seller will own fee simple title to the Property;

(ii)    this Agreement has been properly executed on behalf of Seller by its duly authorized officer and any and all actions, which are or may be necessary to fully authorize Seller to enter into and perform this Agreement have been properly obtained;



(iii)    the execution and delivery of this Agreement and the consummation of the transactions contemplated herein shall not constitute a default by Seller of any other agreement to which Seller is a party;

(iv)    except as otherwise described herein, Seller has not engaged any broker or agent with respect to the purchase and sale contemplated under this Agreement;

(v)    Seller has not received any notice from any governmental authority of any taking of the Property or any portion thereof by eminent domain and, to its knowledge, no condemnation or any taking of the Property is contemplated or threatened by any such governmental authority;

(vi)    neither the Property nor any portion thereof is in violation of any federal, state or local law, ordinance or regulation relating to any Hazardous Substances and there exists no presence, use, treatment, storage, release or disposal of any Hazardous Substances at, on or beneath the Property which has created or is likely to create any liability (public or private) of owners or occupants of the Property under any current federal, state or local law or regulation or which would require reporting to a governmental agency. No Hazardous Substances are present at, on or beneath any parcel of property or property adjacent to the Property and no parcel or property adjacent to the Property is in violation of any laws, ordinances, rules or regulations with respect to Hazardous Substances. As used herein, the term "Hazardous Substances" means petroleum, petroleum products, asbestos, asbestos containing materials, polychlorinated bi-phenyls ("PCBs") any other hazardous, toxic or dangerous substance, material, or waste as defined for purposes of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9061 ("CERCLA"); Hazardous Materials Transportation Act, 49 U.S.C. Section 1802 ("HMTA"); the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 ("RCRA"), and all amendments to the foregoing, or any other federal, state or local law, ordinance, rule or regulation applicable to the Property, and establishing liability, standards or required action as to discharge, spillage, storage, uncontrolled loss, seepage, filtration, disposal, removal, use or existence of a hazardous, toxic or dangerous substance, material or waste. No asbestos, asbestos containing materials or PCBs are contained in or stored on or under the Property. There has never been a landfill containing decomposable material, petroleum wells, mineral-bearing mines, sewage

*Page 6 of 18*



treatment facilities, storage tanks, sink holes, radon or other toxic emissions in, on or under the Property;

(vii)  there are no encroachments upon the Property from adjacent land or landowners and there are no encroachments of any improvements located upon the Property into any adjacent land;

(viii)  there are no pending or threatened actions, suits, proceedings or bankruptcies against Seller of the Property which might affect the Property, Seller's title thereto, or the ability of Seller to perform its obligations hereunder; and

(ix)  there are no persons or parties who will have any right of possession of or with regard to the Property beyond the Closing Date.

B.  Seller will not take, or cause to be taken, any action, which would cause or threaten to cause, any of the representations stated herein to become incorrect or untrue.

8.  PURCHASER'S REPRESENTATIONS.

A.  Purchaser represents to Seller as follows:

(i)  this Agreement has been properly executed on behalf of Purchaser by its duly authorized officer and any and all actions which are or may be necessary to fully authorize Purchaser to enter into and perform this Agreement have been properly obtained; and

(ii)  the execution and delivery of this Agreement and the consummation of the transactions contemplated herein shall not constitute a default by Purchaser of any other agreement to which Purchaser is a party; and

(iii)  except as otherwise disclosed herein, Purchaser has not engaged any broker or agent with respect to the purchase and sale contemplated under this Agreement.

B.  Purchaser will not take, or cause to be taken, any action which would cause or threaten to cause, any of the representations stated herein to become incorrect or untrue.

9.  CONDITIONS PRECEDENT.  The Purchaser's obligation to purchase the

Property hereunder is expressly made subject to the satisfaction (or waiver by the Purchaser) of each of the following conditions contained herein on or before the Closing Date (or any earlier date expressly set forth below).

        (i)     Seller shall have performed and complied in all material respects with all obligations, covenants, and agreements which are to be performed or complied with by Seller pursuant to the provisions of this Agreement;

        (ii)    All of Seller's representations and warranties set forth in this Agreement are true, complete, and accurate in all material respects when made and on the Closing Date.

If any of the conditions to Purchaser's performance set forth in this Agreement have not been duly satisfied by the Closing Date or earlier date specified as to each condition, the Purchaser may rescind this Agreement by written notice to the Seller on or before the Closing Date or the earlier date expressly set forth above, in which event the Earnest Money (less $100.00 which shall be remitted by Escrow Agent to Seller as the Seller's sole consideration for entering into this Agreement) shall be promptly refunded to the Purchaser by the Escrow Agent. Thereafter, the parties hereto shall have no further rights, duties or obligations hereunder, except as is otherwise specifically provided in this Agreement. In the event that the party having the right to rescind this Agreement does not so elect to rescind this Agreement on or before the Closing Date or earlier date specified above, then such condition shall be deemed waived and this Agreement shall continue in full force and effect.

10.    <u>BROKERAGE DISCLOSURE</u>. Seller and Purchaser acknowledge that they have not worked with any third party in connection with this transaction other than Cushman & Wakefield and Trademark Properties. Seller shall be responsible for the payment of all brokerage fees in connection with this transaction.

11.    <u>DAMAGE AND CONDEMNATION</u>.

    A.    <u>Risk of Loss</u>. The Seller shall bear all risk of loss with respect to the Property until the Closing.

    B.    <u>Condemnation</u>. In the event of any condemnation with respect to any material portion of the Property, the Purchaser may elect to (i) terminate this Agreement and receive a refund of all Earnest Money or (ii) consummate the purchase of the Property in accordance with the terms and provisions hereof and without any diminution in the purchase price on account of such condemnation in which event the Seller shall, at the Closing, pay to the Purchaser all condemnation awards and other payments previously received in connection with such condemnation and assign to the Purchaser all of Seller's rights to receive any award payable on account of such condemnation.



12.   <u>NOTICES</u>.

Any notice, approval, requests, demands, tenders, or other communication which may be required or permitted to be given or delivered hereunder shall be in writing and shall be deemed to have been given, delivered and received (i) as of the date when the notice is actually delivered, or (ii) if mailed, in the United States Mail, certified, return receipt requested, to the address for each party set forth below, as of the date which is the date of the post mark on such notice, or (iii) if delivered by courier or express mail service, telegram or mailgram, to the address for each party set forth below, where the carrier provides or retains evidence of the date of delivery, as of the date of such delivery, or (iv) one (1) day after being delivered to a nationally recognized commercial courier for next day delivery, to the address for each party set forth below, or (v) when transmitted by email to the email address for each party set forth below.

SELLER:

Richard C. Davis
Equity Acquisitions-Trademark, LLC
1175 C Folly Road
Charleston, SC 29412

PURCHASER:

Mr. Aaron Gorin
Cedar Grove Capital
888 Woodmere Place
Woodmere, NY 11598

With a copy to:

ESCROW AGENT:

Madison Title Agency
1125 Ocean Avenue, #1
Lakewood, NJ 08701
Attn:  Hindy Wosner
Hwosner@madisontitle.com

Any party may by notice to the other in the manner provided above, designate a different address for receiving notices under this Agreement.  A post office box shall not be the only notice address for either Seller or Purchaser.  Any notice which is delivered to the notice address on a non-business day shall be deemed given the next business day if left at the notice address; or, if not left at the notice address, the next business day when re-delivered to the notice address.  The refusal to accept delivery shall not prevent any notice from being effectively given.  A non-business



day is a Saturday, Sunday or any legal holiday when national banks are closed for business to the general public.

13.    DEFAULT.

A.     Remedies of Purchaser.

(i)     In the event the Closing does not occur in accordance with the terms of this Agreement because of the inability of the Seller to convey good and marketable fee simple title to the Property because of title defects or objections, the Purchaser's sole right and exclusive remedy shall be either to (a) terminate this Agreement in which event the Earnest Money previously paid by Purchaser shall be immediately refunded to the Purchaser or (b) waive such inability and proceed to close the transaction without regard thereto. Despite the provisions of this Paragraph 13(A)(i), Purchaser may cure any monetary liens created, assumed or suffered by Seller against the Property and pay the same at Closing from the purchase price in accordance with the provisions of Paragraph 4 of this Agreement.

(ii)    In the event the Closing does not occur in accordance with the terms of this Agreement due to the default of the Seller hereunder, the Purchaser shall have the right of specific performance against Seller. In addition to the right to specific performance, Purchaser shall have the right to demand from Seller reimbursement for (a) all of Purchaser's out of pocket expenses, and (b) all consequential and incidental damages incurred by Purchaser as a result of Seller's breach of this Agreement.

B.     Remedies of Seller. If the Closing does not occur in accordance with the terms of this Agreement due to the default of the Purchaser, or in the event of a breach by the Purchaser of its obligations hereunder, the Seller shall be entitled to receive the Earnest Money previously paid by Purchaser as full, final and complete liquidated damages. The parties understand and agree that (i) actual damages would be difficult or impossible to ascertain in the event of such default or breach and (ii) the sum specified as liquidated damages is a reasonable estimation of the probable loss which would be sustained by the Seller by reason of such default or breach and is not a penalty or forfeiture.

14.    ESCROW INSTRUCTIONS.

Disbursement of Funds. At such time as Escrow Agent receives written Notice from Seller or Purchaser, or both, stating the identity of the party to whom the Earnest Money is to be disbursed, Escrow Agent shall disburse such Earnest Money pursuant to such notice; provided, however, that if such notice is given by either Seller or Purchaser but not both, Escrow Agent shall notify the other party in writing of such notice and shall withhold disbursement of the Earnest Money for a period of fifteen (15) calendar days after giving such notice and if Escrow Agent receives written



Notice from either Seller or Purchaser within such fifteen (15) day period, which notice countermands or disputes the earlier notice of disbursement, then Escrow Agent shall withhold such disbursement until both Seller and Purchaser can agree upon a disbursement of the Earnest Money. Notwithstanding the foregoing, if Purchaser notifies Escrow Agent on or before the expiration of the Inspection Period of its election to terminate this Agreement pursuant to Paragraph 5(B), then no confirming notice from Seller shall be required by Escrow Agent, and Escrow Agent shall promptly disburse the Earnest Money as provided in Paragraph 5(B), without requesting or waiting for confirming notice from Seller. Seller and Purchaser agree to send to the other a duplicate copy of any written notice sent to Escrow Agent requesting disbursement or countermanding or disputing a request for disbursement.

A.     Limited Liability.  In performing any of its duties hereunder, Escrow Agent shall not incur any liability to anyone for any damages, losses or expenses, except for any negligence, willful misconduct or breach of trust by Escrow Agent under this Agreement, and, accordingly, Escrow Agent shall not incur any such liability with respect to the following: (a) any action taken or omitted in good faith upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of Escrow Agent under this Agreement; or (b) any action taken or omitted in reliance on any instrument, including any written notice or instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

B.     Disputes.  Notwithstanding anything in this Agreement to the contrary, upon a dispute between Seller and Purchaser sufficient in the sole discretion of Escrow Agent to justify its doing so, or if Escrow Agent has not disbursed the Earnest Money on or before the thirtieth day (30th) day following the Closing Date specified in Paragraph 6(A) (as the same may be extended as provided herein or by agreement of Purchaser and Seller), then Escrow Agent shall be entitled to tender into the registry or custody of any court of competent jurisdiction the Earnest Money, together with such pleadings as it may deem appropriate, and thereupon be discharged from all further duties and liabilities under this Agreement (other than with respect to any liabilities for negligence, willful misconduct or breach of trust by Escrow Agent).

C.     Indemnity.  Seller and Purchaser indemnify Escrow Agent against, and hold Escrow Agent harmless from, any and all claims, actions, demands, losses, damages, expenses (including, without limitation, court costs, attorneys' fees and accountant's fees) and liabilities that may be imposed upon performance of its duties under this Paragraph 14, including, without limitation, any litigation arising from this Agreement or involving the subject matter of this Agreement, but excluding any such claims, actions, demands, losses, damages, expenses and liabilities resulting from or arising out of any negligence, willful misconduct or breach of trust by Escrow Agent under this Agreement.  If there is any litigation arising from this Agreement or involving the subject matter hereof, and if Seller and Purchaser are opposing parties in such litigation, then the party prevailing in such litigation shall be reimbursed promptly upon demand by the other such party in an amount equal to that amount which the prevailing party shall have paid Escrow Agent with respect to such litigation and its subject matter pursuant to the indemnification agreement contained in this Paragraph 14(D). The provisions of this Paragraph 14(D) shall survive the Closing or any termination, cancellation or rescission of this Agreement.

15.     PROPERTY SOLD "AS IS".

All of the Property shall be purchased by Purchaser "AS IS, WITH ALL FAULTS", except as otherwise expressly provided for herein; and Seller makes no warranties or representations, express or implied, with respect to the quality or conditions thereof, merchantability or fitness for any use or purpose or compliance with law, except as otherwise specifically provided herein.



16.    LIENS AND ENCUMBRANCES.

Purchaser shall have no authority, expressed or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon or in any manner, to bind the interest of Seller in the Property or to charge the proceeds payable hereunder for any claim in favor of any person dealing with Purchaser, including those who may furnish materials or perform labor for any construction or repairs, and any such liens shall be attached to, if at all, only the Purchaser's interest, if any, granted the Purchaser by this instrument. Purchaser covenants and agrees that it will pay or cause to be paid all sums legally due and payable by or on account of any labor performed or materials furnished in connection with any work performed on the Property on which any lien is or can be validly or legally asserted against its interest, if any, in the Property with improvements thereon and that it will save and hold Seller harmless of any and all loss, costs or expense, based upon or arising out of asserted claims or liens against the Purchaser's estate, if any, or against the right, title or interest of the Seller in the Property under the terms of this Agreement, except for indemnities which by the express written terms of this Agreement are to survive the termination or cancellation of this Agreement. This Paragraph shall survive any termination or cancellation of this Agreement.

17.    LIKE-KIND EXCHANGES.

Each party acknowledges and agrees that the other may engage in an exchange of likekind property, using a qualified intermediary, pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, in connection with its disposition of the Property. Each party agrees to cooperate with any such like-kind exchange; provided (i) such party shall not be required to execute any instrument that increases such party's obligations or decrease its rights under this Agreement, (ii) such party shall not be required to incur any liability, cost or expense, and (iii) such party shall not be required to take title to any other property. Such party agrees to consent to the other party's assignment of this Agreement to a qualified intermediary in order to facilitate such like-kind exchange so long as such assignment does not adversely affect such party's rights hereunder, and such party agrees that it will have no recourse whatsoever against any qualified intermediary to whom this Agreement is assigned; provided the other party's assignment of this Agreement to a qualified intermediary shall not result in the other party being released from its obligations and liabilities hereunder.

18.    MISCELLANEOUS.

A.    Termination.  In the event this Agreement is terminated pursuant to the terms hereof or otherwise, the terminating party shall give notice thereof to the other party and this Agreement shall be null and void and of no force or effect and the parties shall have no rights, obligations or liabilities hereunder, except those which expressly survive the termination of this Agreement.

B.    Waiver.  The failure of any party to exercise any right given hereunder or to insist upon strict compliance with any term, condition or covenant specified herein shall not constitute



a waiver of such party's right to exercise such right or to demand strict compliance with any such term, condition or covenant under this Agreement.

C.    Entire Agreement.  This Agreement contains the sole and entire agreement of the Seller and the Purchaser with respect to the transaction contemplated hereunder and no representation, inducement, promise or agreement, parole or written, between the Purchaser and the Seller and not incorporated herein shall be of any force or effect.  Any previous agreement between the Seller and the Purchaser regarding the purchase of the Property shall be deemed null and void.  Any amendment to this Agreement shall be in writing and executed by the Purchaser and the Seller.

D.    Successors and Assigns.  The provisions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and the respective successors, successors in title and permitted assigns.  Purchaser may freely assign this Agreement to any entity in which Purchaser (or any affiliate of Purchaser) retains or exercises managerial control without the prior written consent of Seller.

E.    Intentionally Omitted.

F.    Survival of Provisions.  The provisions of this Agreement shall not merge into the documentation from this transaction but shall survive the Closing of this transaction and the execution and delivery of the limited warranty deed pursuant hereto.

G.    Applicable Law.  This Agreement and all amendments hereto shall be governed by and construed under the laws of the State of South Carolina.

H.    Severability.  If any term, covenant or condition of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, such provision, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall be deemed severable, and the remainder hereof shall not be affected thereby, and each term, covenant, or condition of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

I.    Date of this Agreement.  In the event that any date or deadline set forth in this Agreement occurs on a Saturday, Sunday or legal holiday, such date or deadline shall automatically be extended to the next date which is not a Saturday, Sunday or legal holiday.  The date of "final execution" and the "Effective Date" of this Agreement shall be the date of the last signature of Purchaser and Seller to this Agreement.

J.    Possession.  Full and complete possession of the Property shall be delivered to Purchaser at Closing.



K.    Counterparts. This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which together shall constitute one and the same Instrument.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed, under seal, as of the day and year indicated opposite their names below.

| | |
|---|---|
| 12/7/16 <br><br> Date of Execution | **SELLER:** <br><br> **Equity Acquisitions-Trademark, LLC, a South Carolina limited liability company** <br><br> By: Richard C. Davis <br><br> Name: _____ Title: _____ |
| 12/7/16 <br><br> Date of Execution | **PURCHASER:** <br><br> CEDAR   GROVE   SC   III,   LLC,   a DE LLC <br><br> By: AARON GORIN <br><br> Name: _____ Title: _____ |

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed, under seal, as of the day and year indicated opposite their names below.

CONSENTED TO FOR THE PURPOSE
OF SERVING AS ESCROW AGENT:

_____          **MADISON TITLE AGENCY**

By:___

_____          Name:_____
                             Title: _____

**EXHIBIT "A"**
**LEGAL DESCRIPTION OF XXX PROPERTY**

**EXHIBIT "A"**
**LEGAL DESCRIPTION OF XXX PROPERTY**



*Page 17 of 18*



**EXHIBIT "B"**
**LIST OF DUE DILIGENCE ITEMS TO BE PROVIDED BY SELLER**

Seller shall provide the following materials to Purchaser, by **electronic delivery,** pursuant to Sections 5A and 5B of the Agreement, to the extent in Seller's or Seller's property manager's actual possession:

12 month budget
12 month statement for cash 2014
12 month statement for cash 2015
12 month statement for cash 2016
Utility Bills for calendar year 2016, 2015 by month
Monthly Occupancy History for 2015 and 2016
Bank Statements monthly for 2015 and 2016
Business license
Service contracts
Rent Roll- current, and by month for the trailing 12 months
5 year Capital Expenditure history

Environmental report
Property Condition report
Survey
Final title proforma loan policy (combined)
5 year income statement
5 year property status report

# EXHIBIT B

# LETTER OF INTENT

See attached.



**November 23, 2016**

# Letter of Intent

This Letter of Intent sets forth the terms and conditions upon which the undersigned ("Buyer") and or its assigns, will purchase the referenced Property. This Letter of Intent constitutes an expression of the Buyer's intent only and that any final and binding agreement shall be subject to the preparation, negotiation and execution of definitive legal documents, including, without limitation, a Purchase and Sale Agreement. Subject to the foregoing limitations, it is the intention of the parties hereto to enter into a purchase and sale agreement (the "PA") that contains, among other provisions, the following terms and conditions:

**1. Properties:**
   1. Residences at Haywood, Greenville, 96 units

**2. Consideration**
   In consideration for the sale of the aforementioned units, the Buyer shall pay to the Seller the total amount of **$5,675,000**

**3. Form of Contract**
   Upon acceptance of this non-binding letter of intent, **Seller** shall prepare a purchase agreement including the items contained herein and further expand upon items of responsibility of each party, due diligence requirements, and all legal rights and obligations incumbent upon both/either the Buyer & the Seller.

**4. Due Diligence**
   Within **5 business days** of Seller's acceptance of the purchase agreement, Buyer shall deposit, in escrow with **Madison Title**, the earnest money of **$50,000**. Buyer shall then have a period of **45 days** during which to make inspections during which earnest money shall remain refundable.

   Seller shall bear no cost or liability whatsoever for Buyer's actions and Buyer shall hold Seller harmless from any suits brought as a result of Buyer's efforts during this Study Period. Buyer may cancel the Purchase and Sale Agreement at any time during this Study Period for any reason, or no reason at all, by written notice to Seller. In the event Buyer cancels the Purchase and Sale Agreement during this Study Period, all Deposits shall be refunded in full to the Buyer. Seller shall provide Buyer with copies of all Leases and Contracts encumbering the Properties during this Study Period.

**5. Financing**
   This offer has **no financing contingency**.

**6. Closing**
   Closing shall take place **on or about 30 days** following the conclusion of the due diligence period.

888 Woodmere Place Suite C, Woodmere NY 11598



## 7. Exclusivity and Purchase/Sale Agreement

Within **five (5) days** after Seller has accepted this Letter of Intent, **Seller** shall submit to Buyer a draft Purchase and Sale Agreement. Seller shall not accept any offer with respect to the sale of the Property from the time of Seller's acceptance of this Letter of Intent through the expiration of the Due Diligence Period. All terms, conditions, negotiations, and information about this transaction shall be kept strictly confidential by all parties involved.

## 8. Closing Costs & Assignment

Buyer shall pay for costs in connection with the physical inspection and other investigations in connection with its due diligence review. Recording and transfer taxes, recording fees, escrow fees and all other cost and charges of the escrow and closing shall be **split equally** between Buyer and Seller. Buyer shall have the right, after giving written notice to Seller, to assign its rights and obligations under this Letter of Intent and the Purchase Agreement to any entity control by, or under common control of, Buyer.

This Letter of Intent remains open for a period of **5 days** following the day it is dated.

Sincerely,

Aaron Gorin
Managing Partner, Cedar Grove Capital

Signed and accepted on this ___day of_____, 2016 by:

_____

888 Woodmere Place Suite C, Woodmere NY 11598



## Background of Buyer:

Cedar Grove Capital is a value add operator focused on operating quality class B and C multi-family assets in the Mid Atlantic.

## Funding and Execution:

Cedar Grove utilizes capital from its Partners and raises outside capital from a select group of high net worth and family office relationships.

Cedar Grove is also proud to declare that it has never gone to contract and not closed on a transaction and has an impeccable reputation amongst the broker community.

### Portfolio: 2,868 units as of November 2016

| Property | Units | Vintage | Location |
|---|---|---|---|
| Chesterfield Apartments | 294 | 1984 | Winston-Salem, NC |
| Ashton Oaks Apartments | 288 | 1986 | Winston-Salem, NC |
| Twin City Apartments | 285 | 1974 | Winston-Salem, NC |
| Silas Creek Apartments | 234 | 1974 | Winston-Salem, NC |
| Flats at Ginter Park | 692 | 1960-1980 | Richmond, VA |
| Whispering Pines Apartments | 312 | 1976 | Spartanburg, SC |
| Georgetown and Timberlane Apts | 166 | 1989 | Spartanburg, SC |
| Montclaire Estates | 301 | 1972 | Charlotte, NC |
| Dixie Square & Windgate Apts | 196 | 1977 | Midland, TX |
| Village Place Apartments | 100 | 1979 | Odessa, TX |
| Total | 2,868 | | |

888 Woodmere Place Suite C, Woodmere NY 11598

# EXHIBIT C

# MARLEY EMAIL DECEMBER 15, 2016

See attached.

Cobb Dill & Hammett, LLC Mail - Fwd: Residences at Haywood - DD Deliverables Due Today                1/10/19, 5:31 PM

Cobb Dill & Hammett LLC                                                                          Hal Cobb <hcobb@cdhlawfirm.com>

---

## Fwd: Residences at Haywood - DD Deliverables Due Today
6 messages

**Ginger Davis** <gingertrademark@gmail.com>                                                        Tue, Jan 17, 2017 at
To: "Hal E. Cobb" <hcobb@cdhlawfirm.com>

Hal, see my communication below with timeline and acceptance provided by agent for buyer.

Begin forwarded message:

**From:** Paul Marley <Paul.Marley@cushwake.com>
**Subject: Re: Residences at Haywood - DD Deliverables Due Today**
**Date:** December 16, 2016 at 2:52:47 PM EST
**To:** Jacquelyn Aaron <Jacquelyn.Aaron@cushwake.com>, Richard Davis <richardtrademark@gmail.com>, Ginger Davis <gingertrademark@gmail.com>

All -

The buyer is good to go with everything in the Dropbox folder.

Paul Marley
Cushman & Wakefield
704.641.8004
paul.marley@cushwake.com

From: Jacquelyn Aaron <jacquelyn.aaron@cushwake.com>
Sent: Thursday, December 15, 2016 1:56 PM
Subject: RE: Residences at Haywood - DD Deliverables Due Today
To: Richard Davis <richardtrademark@gmail.com>, Ginger Davis <gingertrademark@gmail.com>
Cc: Paul Marley <paul.marley@cushwake.com>

Good Afternoon, Ginger and Richard –

Please see the revised escrow timeline below. The Buyer mentioned he was going through the Dropbox. He has not stated yet if he was in need of any additional deliverables. Please let me know if you have any objections to the below timeline. Thank you!

| | |
|---|---|
| SELLER: | Trademark Properties |
| PURCHASER: | Cedar Grove |
| PROPERTY: | Residences at Haywood |
| BROKER: | Paul Marley |
| ESCROW: | Madison Title Agency - Hindy Wosner |
| PURCHASE PRICE: | $5,775,000 |

| | |
|---|---|
| **Effective Date of the Contract** | December 7, 2016 |
| **Due Diligence Deliverables Due** | DELIVERED December 13, 2016 |
| **Deposit Due ($100,000)** | December 14, 2016 |
| **Inspection Date** | January 12, 2017 *30 Days from Seller delivers full list due diligence items on Exhibit "B"* |
| **Title Objection Deadline** | January 12, 2017 *By inspection date deadline* |
| *Seller's Notice of Right to Cure* | On or Before 5th Day Following Notice of Objections |
| **Closing Date** | January 27, 2017* 15 Days from the date of the end of the inspection Period |

Jacquelyn Aaron
Transaction Coordinator
Multifamily Advisory Group
Direct: +1 704 918 1146
Mobile: +1 704 996 9549
Fax:    +1 704 837 0690
jacquelyn.aaron@cushwake.com

440 S. Church Street, Suite 250
Charlotte, NC 28202 | USA

**From:** Ginger Davis [mailto:gingertrademark@gmail.com]
**Sent:** Tuesday, December 13, 2016 11:46 AM
**To:** Richard Davis
**Cc:** Jacquelyn Aaron; Paul Marley
**Subject:** Re: Residences at Haywood - DD Deliverables Due Today

I have added everything. Please keep in mind the last 2 years are without hotel management or flag. Last 2 years were transition period while we worked out an exit from franchise. The majority of the expenses are hotel related and would not be part of an apartment operation. They also have not been reconciled so the 2016 is subject to change, I can send another copy when adjustments are posted?

On Dec 13, 2016, at 11:02 AM, Richard Davis <richardtrademark@gmail.com> wrote:

We should be able to get those for him. Thanks Jacquelyn!

RCD

On Tue, Dec 13, 2016 at 10:35 AM, Jacquelyn Aaron <Jacquelyn.Aaron@cushwake.com> wrote:

Richard,

The Buyer followed up and still requests the bank statements and P&L statements.

Thank you!

**Jacquelyn Aaron**
Transaction Coordinator
Multifamily Advisory Group
Direct: +1 704 916 1146
Mobile:+1 704 996 9549
Fax:   +1 704 837 0590
jacquelyn.aaron@cushwake.com

440 S. Church Street, Suite 250
Charlotte, NC 28202 | USA

**From:** Richard Davis [mailto:richardtrademark@gmail.com]
**Sent:** Tuesday, December 13, 2016 9:31 AM
**To:** Jacquelyn Aaron
**Cc:** Ginger Davis; Paul Marley

**Subject:** Re: Residences at Haywood - DD Deliverables Due Today

Thanks Jacquelyn,

I'm out of the loop so feel free to ignore this analogy,  but to me the best way to advise the buyer/bank to look at this asset would be as if the previous years it was raw land because this asset was never Multifamily until recently and the hotel financial are not apple to apples, we had a pretty big payroll when it operated as a hotel and we fed people, washed their clothes and cleaned their rooms, it's not the same model and I do not see how it will be a true financial snap shot when filled into a Multifamily financial model.

Visualize if i dropped the sticks and bricks that sit on the dirt right now, there would be zero income, that is what we did, changed the use, stripped it down to ground zero and have started the multifamily transition with the Greenville Housing contract, and decided to let the pros do it, not our bailiwick. So there is no operating history in previous years as a multifamily asset, theoretically it was raw land with a hotel operating on top of to...2 different animals.

Hope that helps, I know you guys do tons of these and you would normally have rents and vacancies, etc...Sorry to have empty lines, we just don't have a Multifamily operating history to provide.

Best,

Richard

On Tue, Dec 13, 2016 at 9:13 AM, Jacquelyn Aaron <Jacquelyn.Aaron@cushwake.com> wrote:
Good Morning, All!

Please see the Chart from Exhibit B  of the PSA and my notes of what is in the Dropbox. If there is nothing in the Column, it is missing. There are still a number of items missing. Please let us know per item what is unavailable/not applicable so I convey that to the Buyers. Thank you!

| Requested | In Dropbox |
| --- | --- |
| 12 Month Budget | Pro Forma |
| 12 Month Statement for cash 2014 | |
| 12 Month Statement for cash 2015 | |
| 12 Month Statement for cash 2016 | Operating Statement (2016.06.01-2016.12.13) |
| | |
| Utility Bills for calendar year 2016, 2015 by month | Electric 2015 & 2016 - Building 1-12 |
| | Electric Clubhouse 2015 & 2016 |
| | Gas (2015.12 - 2016.11) |
| | Water (2013-2016) |
| | |
| Monthly Occupancy History for 2015 and 2016 | |
| Bank Statements monthly for 2015 and 2016 | |
| Business License | SC Retail License, City of Greenville Business License |
| Service Contracts | Charter Service Contract |

| Rent Roll – current, and by month for the trailing 12 months | Current Only (2016.11.21) |
|---|---|
| 5 year Capital Expenditure History | CapEx Budget |
| Environmental Report | ESA Order - not Report |
| Property Condition Report | |
| Survey | Survey dated (2016.10.12) |
| Final title proforma loan policy (combined) | |
| 5 year income statement | |
| 5 year property status report | |

Jacquelyn Aaron
Transaction Coordinator
Multifamily Advisory Group

Direct: +1 704 918 1148
Mobile:+1 704 996 9549
Fax:    +1 704 837 0590
jacquelyn.aaron@cushwake.com

440 S. Church Street, Suite 250
Charlotte, NC 28202 | USA

**From:** Ginger Davis [mailto:gingertrademark@gmail.com]
**Sent:** Monday, December 12, 2016 7:51 PM
**To:** Jacquelyn Aaron
**Cc:** Richard Davis; Paul Marley
**Subject:** Re: Residences at Haywood - DD Deliverables Due Today

Hi all! Everything should be there except items that I do not think would apply to this deal. All hotel info was removed and we have provided an apartment level statement since June when we started renting long term. The letter from Greenville has an email attached. I left that because I believe it is important to see that the exception on zoning hearing is in the event you are doing 25% or less of the value in improvements. I can't imagine you would put more than $1,500,000 into the property in renovation at one time, so it should fit that exception. Please let me know if you would like a full size survey overnighted and if there is anything I have missed. Thanks all!

Ginger Davis

On Dec 12, 2016, at 11:48 AM, Jacquelyn Aaron <Jacquelyn.Aaron@cushwake.com> wrote:

Hi Ginger and Richard,

Per the escrow timeline I initially sent over, the Due Diligence Deliverables are due today. Please advise when the DropBox is ready to be double checked to review the uploaded files against Exhibit B.

Thank you!

Jacquelyn Aaron
Transaction Coordinator
Multifamily Advisory Group

Direct: +1 704 918 1148
Mobile:+1 704 996 9549
Fax:    +1 704 837 0590
jacquelyn.aaron@cushwake.com

<image001.png>

440 S. Church Street, Suite 250
Charlotte, NC 28202 | USA
cushmanwakefield.com

LinkedIn | Facebook | Twitter | YouTube | Google+ | Instagram

The information contained in this communication is confidential, may be privileged and is intended for the exclusive use of the above named addressee(s). If you are not the intended recipient(s), you are expressly prohibited from copying, distributing, disseminating, or in any other way using any information contained within this communication. If you have received this communication in error please contact the sender by telephone or by response via mail.

We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses.

**Hal E. Cobb, Esq.** <hcobb@cdhlawfirm.com>    Tue, Jan 17, 2017 at 2:23 PM
To: Zac Smith <zsmith@cdhlawfirm.com>

Thanks,

Hal

Hal E. Cobb, Esq.

Admitted in South Carolina and Colorado
Cobb Dill & Hammett, LLC
300 W. Coleman Boulevard, Suite 106
Mt. Pleasant, S.C. 29464
843.327.5777 office
843.353.2583 fax

DISCLAIMER:
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or legally privileged material. Any review, retransmission, dissemination or other use of this information, directly or indirectly, by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient please contact the sender and delete the material from all computers in which it resides. Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late, incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachments, that have arisen as a result of e-mail transmission. If verification is required, please request a hard-copy version or contact us by phone.
Any views or opinions presented are solely those of the author and do not necessarily represent those of the firm.

CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we inform you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments or enclosures) is not intended or written to be used, and cannot be used, for the purpose of (i)avoiding penalties that may be imposed under the Internal Revenue Code or any other applicable tax law, or (ii) promoting, marketing or recommending to another party any entity, investment, plan, transaction, arrangement, or other tax related matter.

**From:** Ginger Davis <gingertrademark@gmail.com>
**Date:** Tuesday, January 17, 2017 at 2:12 PM
**To:** "Hal E. Cobb" <hcobb@cdhlawfirm.com>
**Subject:** Fwd: Residences at Haywood - DD Deliverables Due Today

[Quoted text hidden]

**Hal E. Cobb, Esq.** <hcobb@cdhlawfirm.com>    Tue, Jan 17, 2017 at 2:23 PM
To: Zac Smith <zsmith@cdhlawfirm.com>

Thanks,

Hal

Hal E. Cobb, Esq.

Admitted in South Carolina and Colorado
Cobb Dill & Hammett, LLC

Cobb Dill & Hammett, LLC Mail - Fwd: Residences at Haywood - DD Deliverables Due Today

1/10/19, 5:31 PM

300 W. Coleman Boulevard, Suite 106
Mt. Pleasant, S.C. 29464
843.327.5777 office
843.353.2583 fax

DISCLAIMER:
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or legally privileged material. Any review, retransmission, dissemination or other use of this information, directly or indirectly, by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient please contact the sender and delete the material from all computers in which it resides. Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late, incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachments, that have arisen as a result of e-mail transmission. If verification is required, please request a hard-copy version or contact us by phone.
Any views or opinions presented are solely those of the author and do not necessarily represent those of the firm.

CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we inform you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments or enclosures) is not intended or written to be used, and cannot be used, for the purpose of (i)avoiding penalties that may be imposed under the Internal Revenue Code or any other applicable tax law, or (ii) promoting, marketing or recommending to another party any entity, investment, plan, transaction, arrangement, or other tax related matter.

----------

**From:** Ginger Davis <gingertrademark@gmail.com>
**Date:** Tuesday, January 17, 2017 at 2:12 PM
**To:** "Hal E. Cobb" <hcobb@cdhlawfirm.com>
**Subject:** Fwd: Residences at Haywood - DD Deliverables Due Today

[Quoted text hidden]

----------

**Hal Cobb** <hcobb@cdhlawfirm.com>
Draft To: Gentry Collins <gcollins@cdhlawfirm.com>

Thu, Jan 10, 2019 at 5:30 PM

**Forwarded Conversation**
**Subject: Fwd: Residences at Haywood - DD Deliverables Due Today**
------------------------

From: **Ginger Davis** <gingertrademark@gmail.com>
Date: Tue, Jan 17, 2017 at 2:12 PM
To: Hal E. Cobb <hcobb@cdhlawfirm.com>

[Quoted text hidden]
----------
From: **Hal E. Cobb, Esq.** <hcobb@cdhlawfirm.com>
Date: Tue, Jan 17, 2017 at 2:23 PM
To: Zac Smith <zsmith@cdhlawfirm.com>

Thanks,

Hal

Hal E. Cobb, Esq.

Admitted in South Carolina and Colorado
Cobb Dill & Hammett, LLC
300 W. Coleman Boulevard, Suite 106
Mt. Pleasant, S.C. 29464
843.327.5777 office
843.353.2583 fax

Cobb Dill & Hammett, LLC Mail - Fwd: Residences at Haywood - DD Deliverables Due Today                                    1/10/19, 5:31 PM

DISCLAIMER:
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or legally privileged material. Any review, retransmission, dissemination or other use of this information, directly or indirectly, by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient please contact the sender and delete the material from all computers in which it resides. Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late, incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachments, that have arisen as a result of e-mail transmission. If verification is required, please request a hard-copy version or contact us by phone.
Any views or opinions presented are solely those of the author and do not necessarily represent those of the firm.

CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we inform you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments or enclosures) is not intended or written to be used, and cannot be used, for the purpose of (i)avoiding penalties that may be imposed under the Internal Revenue Code or any other applicable tax law, or (ii) promoting, marketing or recommending to another party any entity, investment, plan, transaction, arrangement, or other tax related matter.

From: Ginger Davis <gingertrademark@gmail.com>
Date: Tuesday, January 17, 2017 at 2:12 PM
To: "Hal E. Cobb" <hcobb@cdhlawfirm.com>
Subject: Fwd: Residences at Haywood - DD Deliverables Due Today

From: **Hal E. Cobb, Esq.** <hcobb@cdhlawfirm.com>
Date: Tue, Jan 17, 2017 at 2:23 PM
To: Zac Smith <zsmith@cdhlawfirm.com>

Thanks,

Hal

Hal E. Cobb, Esq.

Admitted in South Carolina and Colorado
Cobb Dill & Hammett, LLC
300 W. Coleman Boulevard, Suite 106
Mt. Pleasant, S.C. 29464
843.327.5777 office
843.353.2583 fax

DISCLAIMER:
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or legally privileged material. Any review, retransmission, dissemination or other use of this information, directly or indirectly, by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient please contact the sender and delete the material from all computers in which it resides. Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late, incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachments, that have arisen as a result of e-mail transmission. If verification is required, please request a hard-copy version or contact us by phone.
Any views or opinions presented are solely those of the author and do not necessarily represent those of the firm.

CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we inform you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments or enclosures) is not intended or written to be used, and cannot be used, for the purpose of (i)avoiding penalties that may be imposed under the Internal Revenue Code or any other applicable tax law, or (ii) promoting, marketing or recommending to another party any entity, investment, plan, transaction, arrangement, or other tax related matter.

**From:** Ginger Davis <gingertrademark@gmail.com>
**Date:** Tuesday, January 17, 2017 at 2:12 PM
**To:** "Hal E. Cobb" <hcobb@cdhlawfirm.com>
**Subject:** Fwd: Residences at Haywood - DD Deliverables Due Today

# EXHIBIT D

# MARLEY EMAIL DECEMBER 23, 2016

See attached.

From: **Ginger A Davis** gingertrademark@gmail.com
Subject: Re: Residences at Haywood
Date: January 16, 2017 at 12:43 PM
To: Paul Marley Paul.Marley@cushwake.com

Hi Paul! I just wanted to see where we stand on everything now that due diligence is up. Thanks! Ginger

Sent from my iPhone

On Dec 23, 2016, at 5:22 AM, Paul Marley <Paul.Marley@cushwake.com> wrote:

Hey Ginger,

The buyer would prefer to hold off on leasing until he has his management team in there. Sorry for the delay in getting back to you.

Hope you all have a Merry Christmas!

Paul Marley
Cushman & Wakefield
704.641.8004
paul.marley@cushwake.com

From: Ginger A Davis <gingertrademark@gmail.com>
Sent: Wednesday, December 21, 2016 9:49 AM
Subject: Residences at Haywood
To: Paul Marley <paul.marley@cushwake.com>

Hi Paul, I wanted to follow up on the leasing question. Did Richard reach out to you? We have a few people who want to rent but I wanted to make sure we know what the policy is on background check for your buyer. The VA has a need for 1 BR units and they have a few people waiting. I didn't want to do anything that wouldn't fit the buyer's model, but I also want to continue leasing up. Please let me know if they prefer we wait or if they have any input.

Sent from my iPhone

The information contained in this communication is confidential, may be privileged and is intended for the exclusive use of the above named addressee(s). If you are not the intended recipient(s), you are expressly prohibited from copying, distributing, disseminating, or in any other way using any information contained within this communication. If you have received this communication in error please contact the sender by telephone or by response via mail.

We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses.

From: Paul Marley Paul.Marley@cushwake.com
Subject: Re:
Date: December 14, 2016 at 3:29 PM
To: Ginger A Davis gingertrademark@gmail.com, Richard Davis richardtrademark@gmail.com

I am still waiting to hear back from him on this but my guess is that he would prefer if we held off. I will get back to you as soon as he confirms.

Dropbox looks good to me, waiting to hear from him on that as well but should be good to go.

Paul Marley
Cushman & Wakefield
704.641.8004
paul.marley@cushwake.com

From: Richard Davis <richardtrademark@gmail.com>
Sent: Tuesday, December 13, 2016 4:45 PM
Subject: Re:
To: Paul Marley <paul.marley@cushwake.com>, Ginger A Davis <gingertrademark@gmail.com>

Paul, please see below....thanks

also, I received your email earlier, will reply in the AM

Best,

RCD

On Tue, Dec 13, 2016 at 12:39 PM, Ginger A Davis <gingertrademark@gmail.com> wrote:
I just spoke with VA and they have 3 or 4 people with vouchers they want to bring over, and also want to put us on their list. They need to know what our policy is on criminal and credit background?  At this point we have been leasing to people we have history on so haven't had to set a policy. Thinking we need to run this past buyer or his agent and get their policy so we don't put people in new agreements that differ from their plan?  Don't want to hold off leasing efforts but also want to make sure we deliver what they need. Let me know your thought.

Sent from my iPhone

The information contained in this communication is confidential, may be privileged and is intended for the exclusive use of the above named addressee(s). If you are not the intended recipient(s), you are expressly prohibited from copying, distributing, disseminating, or in any other way using any information contained within this communication. If you have received this communication in error please contact the sender by telephone or by response via mail.

We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses.

# EXHIBIT E

# PLAINTIFF DEMAND LETTER

See attached.



# CD COBB DILL & & H HAMMETT, LLC

| ATTORNEYS | LOCATION | CONTACT |
|---|---|---|
| Hal E. Cobb, *Partner* | 300 W. Coleman Blvd., Suite 106 | 843-936-6680 (P) |
| Michael Dill, *Partner* | Mt. Pleasant S.C. 29464 | 843-353-2583 (F) |
| William Hammett, *Partner* | | |

January 19, 2017

**Delivery vis USPS First Class Mail and via email:** *paul.marley@cushwake.com*

**Broker:**
Paul Marley
Cushman & Wakefield
44 S. Church Street, Ste. 250

**Delivery vis USPS First Class Mail**

**Purchaser:**
Aaron Gorin
Cedar Grove Capital
888 Woodmere Place
Woodmere, NY 11598

> RE: *Confirmation of Repudiation of Real Estate Purchase Agreement for The Residences at Haywood*

Dear Mr. Marley and Mr. Gorin,

Please allow this letter to serve as notice that our firm represents Richard and Ginger Davis of Equity Acquisitions-Trademark, LLC. At our client's behest, our firm is sending this letter to ascertain information regarding Cedar Grove SC III, LLC (the "**Purchaser**") intentions of performance under the Real Estate Purchase and Sale Agreement (the "**Agreement**") (see Exhibit A) for The Residences at Haywood in Greenville, SC (the "**Property**"). Per our client's oral last communication with Cushman & Wakefield's agent, Paul Marley (collectively, the "**Broker**"), it was unclear if the Purchaser intended to repudiate their performance and did not intend to close on the Property for which was previously bargained.

This news is particularly concerning as our client relied on the Agreement and continued to perform their obligations thereunder. Due to this recent news, our client is demanding specific information for reassurance.

First, our client demands copies of the Articles of Organization, Certificate of Existence, and any other corporate documents for Cedar Grove SC III, LLC.

Second, our client demands that the documentation regarding the **One Hundred Thousand Dollars** ($100,00.00) of escrow money as required in **§ 2 of the Agreement** be provided. Our client request that proof of these funds be provided by either Cushman & Wakefield as broker, or

the Purchaser. In addition to proof that these funds were deposited in escrow, our client demands that documentation of the deposit, signed by the escrow agent, be provided.

Our client demands that you send a written response to our office no later than **Two** (2) business days from receipt of this letter. Our contact information can be found in the heading of this letter. If you have any questions or concerns regarding the above-mentioned, please contact me directly.

## TIME IS OF THE ESSENCE.

Sincerely,

Hal E. Cobb, Esq.
*For Cobb Dill & Hammett, LLC*

HEC/wzs

Cc: Richard and Ginger Davis
Enclosures: As stated.

# EXHIBIT A
See attached.

## REAL ESTATE PURCHASE AND SALE AGREEMENT

**THIS AGREEMENT**, made this 30th day of November, 2016, by and among **Equity Acquisitions-Trademark, LLC**, a South Carolina limited liability company (the "Seller"), **CEDAR GROVE SC III, LLC, a _____** limited liability company (the "Purchaser"), and **MADISON TITLE AGENCY**, a New Jersey corporation  (the "Escrow Agent").

## RECITALS

Seller desires to sell all right, title and interest to (i) an approximately **96** unit apartment complex known as **The Residences at Haywood** located at **48 McPrice Court Greenville, SC 29615** and more fully described in Exhibit "A" attached hereto ("**The Residences at Haywood**") and (identified herein as the "Property") to Purchaser, and Purchaser desires to purchase the Property from Seller.  The Property is more particularly described on Exhibit "A" attached hereto and made a part hereof, and includes all improvements located thereon and all easements and appurtenances thereunto belonging, including any right, title and interest of the Seller in and to adjacent streets, alleys, rights-of-way, permits, zoning and land use approvals, and all development rights affecting, benefiting or burdening the Property.

*Reg*

Seller is the contract purchaser of the Property from **Equity Acquisitions-Trademark, LLC**, a **South Carolina** limited liability company, pursuant to that certain Real Estate Purchase and Sale Agreement dated contemporaneously herewith (the "Underlying Contract").  All of the Seller's obligations hereunder are expressly contingent upon the acquisition of the Property in accordance with the terms of the Underlying Contract.  Seller shall use its commercially reasonable best efforts to acquire the Property prior to the Closing contemplated by this Agreement.

## WITNESSETH:

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, the parties hereto agree as follows:

1.    PURCHASE PRICE.  The Purchase Price ("Purchase Price") shall be **Five Million Seven Hundred Seventy Five Thousand Dollars ($5,775,000).**  The Purchase Price shall be paid by Purchaser to Seller in cash at Closing.

2.    EARNEST MONEY.

A.    Payment of Earnest Money by Purchaser.  The Purchaser, on or before five (5)  business days after the final execution of this Agreement by the Seller, shall deliver to the Escrow

*Page 1 of 18*



Agent the Purchaser's check or wire transfer in the amount of **ONE HUNDRED THOUSAND AND NO/100TH DOLLARS ($100,000.00)** (the "Earnest Money"). Upon the expiration of the Inspection Period set forth in Paragraph 5(b) below, the Earnest Money shall be non-refundable to Purchaser except for the inability or failure of Seller to close the transaction contemplated herein, breach by Seller of its obligations hereunder, or as is otherwise expressly provided for herein.

B.    Application of Earnest Money.

1.    If Purchaser shall exercise any right or option under this Agreement to rescind, cancel or terminate this Agreement during the Inspection Period (as that term is defined in paragraph 5(B) hereof), then Escrow Agent, shall immediately refund the Earnest Money to Purchaser with no further action or demand required by Purchaser, less the sum of ONE HUNDRED AND NO/100TH DOLLARS ($100.00) which shall be paid to Seller in consideration for this Agreement, whereupon this Agreement shall terminate and the parties to this Agreement shall have no further rights, duties or obligations under this Agreement, except as otherwise specifically provided in this Agreement.

2.    At the Closing, Escrow Agent shall pay the Earnest Money to Seller and the Earnest Money shall be applied and credited in reduction of the Purchase Price.

C.    Deposit of Earnest Money.  Escrow Agent shall deposit the Earnest Money in its lawyers trust account at a financial institution whose deposits are insured by the F.D.I.C. chosen by Escrow Agent.

3.    SURVEY.  The Purchaser may, at its sole cost and expense, cause a South Carolina registered surveyor (herein referred to as the "Surveyor") to make a boundary survey (herein referred to as the "Survey") of the Property for the purpose of determining the exact number of acres within the boundary of the Property (to the nearest one thousandth (1/1000th) of an acre), the boundary lines of the Property, the location of all rights-of-way, buffers, easements and encroachments, if any, affecting the Property and any portion of the Property located within an area of special flood hazard as designated by the United States Department of Housing and Urban Development, the Federal Emergency Management Agency or any similar federal, state or local agency. Purchaser will deliver three (3) prints of the Survey, together with a written specification of any objections to the Survey, to Seller not later than the expiration of the Inspection Period, as hereinafter defined. Unless Seller objects to the Survey, the legal description of the Property from the Survey shall become a part of this Agreement without the necessity of any further action by any of the parties hereto and said description shall replace and supersede the description of the Property attached hereto as Exhibit "A" and "A-1".

4.    CONVEYANCE OF TITLE.  The Seller shall convey good and marketable fee simple title to the Property to the Purchaser pursuant to recordable limited warranty deed.  The Property shall be conveyed free and clear of all liens, encumbrances and other exceptions to title, except for (i) those title encumbrances and other exceptions which are approved

Page 2 of 18

by Purchaser in the exercise of its sole discretion; and (ii) the lien for ad valorem taxes not yet due and payable (collectively the "Permitted Title Exceptions"). Not later than the end of the Inspection Period, the Purchaser shall deliver to the Seller a statement of any objections to the Seller's title (including the Permitted Title Exceptions) and the Seller shall have the right (but not the obligation) within a reasonable time thereafter in which to cure any such objections. Seller shall give Purchaser notice of its intent to cure or not cure any title objections within five (5) days after receipt by Seller of Purchaser's title objection notice; but if Seller does not give this notice within such five (5) day period, then Seller shall be deemed to elect not to cure any title objections. In the event that the Seller fails to cure any such objections, Purchaser may (i) terminate this Agreement and receive a refund of all Earnest Money, (ii) remove any such objections (but only as to monetary liens created, assumed or suffered by Seller against the Property) and pay the same at Closing from the Purchase Price in accordance with the amount of money due and payable for such monetary lien, or (iii) waive such objections and close the transaction contemplated by this Agreement in accordance with all of the terms and provisions hereof. At any time prior to the Closing Date, the Purchaser shall have the right to check down the title from and after the Effective Date of the preliminary title examination contemplated in this Paragraph 4 and deliver to the Seller a written statement of any objection which appears in the public records of ~~Spartanburg~~ County, South Carolina and affects title to the Property occurring subsequent to the preliminary title examination. The Seller shall have until the Closing Date to cure, at its expense, any such objection. In the event the Seller fails or refuses to cure such objection prior to the Closing Date, the Purchaser shall have the same rights with respect to such failure or refusal set forth in this Paragraph 4 as to preliminary title objections.

*tey*
Greenville

5.    RIGHT OF INSPECTION.

A.    General. The Seller agrees that, the Purchaser and its agents shall have the right and privilege of going upon the Property to inspect, examine and survey the Property, to plan for the development and use thereof. This right and privilege shall include all examinations and testing deemed necessary or appropriate by Purchaser in its sole discretion, including but not limited to the right to locate utilities, review any zoning conditions or requirements, review any protective or restrictive covenants, make soil tests, borings, percolation tests and all such other inspections, examinations and tests the Purchaser deems necessary to prepare for the development of the Property; provided, however that no grading shall be done and no trees or bushes shall be cut. Purchaser indemnifies and holds Seller harmless from and against loss or damage Seller may incur and any and all liens that may arise as a result of Purchaser's activities or the activities of Purchaser's agents, representatives or designees on the Property and against any and all claims for death or injury to persons or property arising out of or connected with Purchaser's (or its agents, representatives or designees) going upon the Property pursuant to the provisions of this Paragraph 5 or otherwise, and against all costs, expenses and liabilities occurring in or in connection with any such claim or proceeding brought thereon, including, without limitation, court costs and reasonable and actual attorney's fees. This indemnity shall survive the Closing or any termination of this Agreement. Purchaser shall, at Purchaser's expense, restore the Property to substantially the same condition existing at the Effective Date upon completion of inspection

*Page 3 of 18*



activities, but only to the extent any changes were caused by Purchaser, its representatives or designees.

Seller agrees to electronically provide Purchaser with the items listed on Exhibit "B" attached hereto and incorporated herein to the extent such items are within Seller's possession within three (3) business days of the date of this Agreement.

B.    Inspection Period. In the event the Purchaser determines, for any reason or for no reason, and in its sole and absolute discretion, that the Property is not acceptable for its intended use within thirty (30) days from the date Seller electronically delivers the full list of items listed on Exhibit "B" to Purchaser (the "Inspection Period"), the Purchaser shall have the exclusive right and option to terminate this Agreement and to receive a refund of the Earnest Money. During the Inspection Period, Purchaser will make such inspections as Purchaser deems necessary or appropriate to determine the feasibility of Purchaser's intended use of the Property. If Purchaser elects to terminate this Agreement during the Inspection Period, upon written request of Seller, Purchaser agrees to provide Seller with copies of all surveys, reports, tests, studies or any other documents or writings of any kind dealing with the Property which come into Purchaser's possession or control during the pendency of this Agreement, subject to the service provider's permission, if required.

6.    CLOSING.

A.    General. The consummation of the purchase and sale described herein (the "Closing") is to occur on or before fifteen (15) days from the date of the end of the Inspection Period (the "Closing Date"). The Closing shall be held at such location and at a time and date which is mutually agreeable to Seller and Purchaser, or through an "escrow closing" or through the mail. At the Closing, the Seller shall execute and deliver to the Purchaser a limited warranty deed conveying good and marketable fee simple title to the Property free and clear of all liens and encumbrances except the Permitted Title Exceptions.

B.    Taxes. Real property ad valorem taxes assessed against the Property for the year in which the Closing occurs shall be prorated as of the Closing Date. In the event tax bills for the year in which the Closing occurs have not been issued at the time of the Closing, the proration shall be made on the basis of the taxes actually paid for the immediately preceding year. In the event the amount of such taxes is not finally determined at the date of Closing, an appropriate adjustment shall be made between Seller and Purchaser by payment of the difference, if any, when the actual amount of such taxes becomes known. If the Property is included within a larger parcel for taxing purposes, Seller agrees to cause the taxes to be paid on the real property of which the Property forms a part on or before the date such tax bills become delinquent. At the time that the tax bills are received for the year in which the Closing occurs (whether before or after the Closing), the Purchaser and the Seller shall make any adjustments made necessary by reason thereof.

C.    Documents. The Seller and the Purchaser agree that such documents as may be legally necessary or appropriate to carry out the terms of this Agreement shall be executed and



delivered by each party to the other at the Closing, including, but not limited to, an affidavit from the Seller that has as its subject matter averments that, to the actual knowledge of the person signing the affidavit for Seller, (i) there are no rights or claims of parties in possession not shown by the public records, (ii) there are no liens or encumbrances other than those as to which specific provision is made at Closing, (iii) there are no liens, or rights to a lien, for services incurred by Seller (including, but not limited to, real estate brokerage services incurred by Seller), labor or material furnished at the request of Seller and not shown by the public records, (iv) the Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, and the Regulations thereunder, and (v) any other documents requested by the title company insuring the limited warranty deed. The owner's affidavit to be executed by Seller at Closing shall expressly state that nothing contained therein shall in any way be deemed to modify or enlarge the other representations contained in this Agreement or the limited warranty of title which is to be contained in the deed of conveyance from Seller to Purchaser. Seller shall also deliver at closing, an updated certified rent roll, which shall include any arrears and security deposits, a notice to tenants of the sale, an assignment of leases and any arrears and landlord/tenant proceedings, if any, all keys and access codes, original leases, to the extent in Seller's possession or copies thereof, all warranties and guaranties to the extent in Seller's possession.

D.   Expenses of Closing. The Seller shall pay the cost of the State of South Carolina transfer tax and the documentary stamp taxes due on the conveyance of the Property and retroactive real estate taxes. The Purchaser shall pay owner's title insurance premiums, and survey costs for which Purchaser is responsible under Paragraph 3, mortgage taxes, title examination costs, title certification costs, mortgagee title insurance premiums, any fees charged by the Escrow Agent, and any other costs incurred by the Purchaser.

7.   SELLER'S REPRESENTATIONS.

   A.   The Seller makes the following representations, to the actual knowledge of the person signing this Agreement on behalf of Seller but without any independent investigation (provided, however, that the Seller affirmatively represents, without any qualification as to actual knowledge or independent investigation the correctness of items (ii), (iii), and (iv) below):

      (i)   subject to the performance of all parties to the Underlying Contract, Seller will own fee simple title to the Property;

      (ii)   this Agreement has been properly executed on behalf of Seller by its duly authorized officer and any and all actions, which are or may be necessary to fully authorize Seller to enter into and perform this Agreement have been properly obtained;

Page 5 of 18

(iii)   the execution and delivery of this Agreement and the consummation of the transactions contemplated herein shall not constitute a default by Seller of any other agreement to which Seller is a party;

(iv)   except as otherwise described herein, Seller has not engaged any broker or agent with respect to the purchase and sale contemplated under this Agreement;

(v)   Seller has not received any notice from any governmental authority of any taking of the Property or any portion thereof by eminent domain and, to its knowledge, no condemnation or any taking of the Property is contemplated or threatened by any such governmental authority;

(vi)   neither the Property nor any portion thereof is in violation of any federal, state or local law, ordinance or regulation relating to any Hazardous Substances and there exists no presence, use, treatment, storage, release or disposal of any Hazardous Substances at, on or beneath the Property which has created or is likely to create any liability (public or private) of owners or occupants of the Property under any current federal, state or local law or regulation or which would require reporting to a governmental agency. No Hazardous Substances are present at, on or beneath any parcel of property or property adjacent to the Property and no parcel or property adjacent to the Property is in violation of any laws, ordinances, rules or regulations with respect to Hazardous Substances. As used herein, the term "Hazardous Substances" means petroleum, petroleum products, asbestos, asbestos containing materials, polychlorinated bi-phenyls ("PCBs") any other hazardous, toxic or dangerous substance, material, or waste as defined for purposes of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9061 ("CERCLA"); Hazardous Materials Transportation Act, 49 U.S.C. Section 1802 ("HMTA"); the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 ("RCRA"), and all amendments to the foregoing, or any other federal, state or local law, ordinance, rule or regulation applicable to the Property, and establishing liability, standards or required action as to discharge, spillage, storage, uncontrolled loss, seepage, filtration, disposal, removal, use or existence of a hazardous, toxic or dangerous substance, material or waste. No asbestos, asbestos containing materials or PCBs are contained in or stored on or under the Property. There has never been a landfill containing decomposable material, petroleum wells, mineral-bearing mines, sewage

Page 6 of 18

treatment facilities, storage tanks, sink holes, radon or other toxic emissions in, on or under the Property;

(vii) there are no encroachments upon the Property from adjacent land or landowners and there are no encroachments of any improvements located upon the Property into any adjacent land;

(viii) there are no pending or threatened actions, suits, proceedings or bankruptcies against Seller of the Property which might affect the Property, Seller's title thereto, or the ability of Seller to perform its obligations hereunder; and

*Reg*

(ix) there are no persons or parties who will have any right of possession of or with regard to the Property beyond the Closing Date.

B. Seller will not take, or cause to be taken, any action, which would cause or threaten to cause, any of the representations stated herein to become incorrect or untrue.

8. PURCHASER'S REPRESENTATIONS.

A. Purchaser represents to Seller as follows:

(i) this Agreement has been properly executed on behalf of Purchaser by its duly authorized officer and any and all actions which are or may be necessary to fully authorize Purchaser to enter into and perform this Agreement have been properly obtained; and

(ii) the execution and delivery of this Agreement and the consummation of the transactions contemplated herein shall not constitute a default by Purchaser of any other agreement to which Purchaser is a party; and

(iii) except as otherwise disclosed herein, Purchaser has not engaged any broker or agent with respect to the purchase and sale contemplated under this Agreement.

B. Purchaser will not take, or cause to be taken, any action which would cause or threaten to cause, any of the representations stated herein to become incorrect or untrue.

9. CONDITIONS PRECEDENT. The Purchaser's obligation to purchase the

*Reg*

Property hereunder is expressly made subject to the satisfaction (or waiver by the Purchaser) of each of the following conditions contained herein on or before the Closing Date (or any earlier date expressly set forth below).

> (i)    Seller shall have performed and complied in all material respects with all obligations, covenants, and agreements which are to be performed or complied with by Seller pursuant to the provisions of this Agreement;

> (ii)    All of Seller's representations and warranties set forth in this Agreement are true, complete, and accurate in all material respects when made and on the Closing Date.

If any of the conditions to Purchaser's performance set forth in this Agreement have not been duly satisfied by the Closing Date or earlier date specified as to each condition, the Purchaser may rescind this Agreement by written notice to the Seller on or before the Closing Date or the earlier date expressly set forth above, in which event the Earnest Money (less $100.00 which shall be remitted by Escrow Agent to Seller as the Seller's sole consideration for entering into this Agreement) shall be promptly refunded to the Purchaser by the Escrow Agent. Thereafter, the parties hereto shall have no further rights, duties or obligations hereunder, except as is otherwise specifically provided in this Agreement. In the event that the party having the right to rescind this Agreement does not so elect to rescind this Agreement on or before the Closing Date or earlier date specified above, then such condition shall be deemed waived and this Agreement shall continue in full force and effect.

10.    BROKERAGE DISCLOSURE. Seller and Purchaser acknowledge that they have not worked with any third party in connection with this transaction other than Cushman & Wakefield and Trademark Properties. Seller shall be responsible for the payment of all brokerage fees in connection with this transaction.

11.    DAMAGE AND CONDEMNATION.

A.    Risk of Loss. The Seller shall bear all risk of loss with respect to the Property until the Closing.

B.    Condemnation. In the event of any condemnation with respect to any material portion of the Property, the Purchaser may elect to (i) terminate this Agreement and receive a refund of all Earnest Money or (II) consummate the purchase of the Property in accordance with the terms and provisions hereof and without any diminution in the purchase price on account of such condemnation in which event the Seller shall, at the Closing, pay to the Purchaser all condemnation awards and other payments previously received in connection with such condemnation and assign to the Purchaser all of Seller's rights to receive any award payable on account of such condemnation.



12.   NOTICES.

Any notice, approval, requests, demands, tenders, or other communication which may be required or permitted to be given or delivered hereunder shall be in writing and shall be deemed to have been given, delivered and received (i) as of the date when the notice is actually delivered, or (ii) if mailed, in the United States Mail, certified, return receipt requested, to the address for each party set forth below, as of the date which is the date of the post mark on such notice, or (iii) if delivered by courier or express mail service, telegram or mailgram, to the address for each party set forth below, where the carrier provides or retains evidence of the date of delivery, as of the date of such delivery, or (iv) one (1) day after being delivered to a nationally recognized commercial courier for next day delivery, to the address for each party set forth below, or (v) when transmitted by email to the email address for each party set forth below.

SELLER:

Richard C. Davis
Equity Acquisitions-Trademark, LLC
1175 C Folly Road
Charleston, SC 29412

PURCHASER:

Mr. Aaron Gorin
Cedar Grove Capital
888 Woodmere Place
Woodmere, NY 11598

With a copy to:

ESCROW AGENT:

Madison Title Agency
1125 Ocean Avenue, #1
Lakewood, NJ 08701
Attn: Hindy Wosner
Hwosner@madisontitle.com

Any party may by notice to the other in the manner provided above, designate a different address for receiving notices under this Agreement. A post office box shall not be the only notice address for either Seller or Purchaser. Any notice which is delivered to the notice address on a non-business day shall be deemed given the next business day if left at the notice address; or, if not left at the notice address, the next business day when re-delivered to the notice address. The refusal to accept delivery shall not prevent any notice from being effectively given. A non-business



day is a Saturday, Sunday or any legal holiday when national banks are closed for business to the general public.

13.     DEFAULT.

A.     Remedies of Purchaser.

(i)     In the event the Closing does not occur in accordance with the terms of this Agreement because of the inability of the Seller to convey good and marketable fee simple title to the Property because of title defects or objections, the Purchaser's sole right and exclusive remedy shall be either to (a) terminate this Agreement in which event the Earnest Money previously paid by Purchaser shall be immediately refunded to the Purchaser or (b) waive such inability and proceed to close the transaction without regard thereto. Despite the provisions of this Paragraph 13(A)(i), Purchaser may cure any monetary liens created, assumed or suffered by Seller against the Property and pay the same at Closing from the purchase price in accordance with the provisions of Paragraph 4 of this Agreement.

(ii)     In the event the Closing does not occur in accordance with the terms of this Agreement due to the default of the Seller hereunder, the Purchaser shall have the right of specific performance against Seller. In addition to the right to specific performance, Purchaser shall have the right to demand from Seller reimbursement for (a) all of Purchaser's out of pocket expenses, and (b) all consequential and incidental damages incurred by Purchaser as a result of Seller's breach of this Agreement.

B.     Remedies of Seller. If the Closing does not occur in accordance with the terms of this Agreement due to the default of the Purchaser, or in the event of a breach by the Purchaser of its obligations hereunder, the Seller shall be entitled to receive the Earnest Money previously paid by Purchaser as full, final and complete liquidated damages. The parties understand and agree that (i) actual damages would be difficult or impossible to ascertain in the event of such default or breach and (ii) the sum specified as liquidated damages is a reasonable estimation of the probable loss which would be sustained by the Seller by reason of such default or breach and is not a penalty or forfeiture.

14.     ESCROW INSTRUCTIONS.

Disbursement of Funds. At such time as Escrow Agent receives written Notice from Seller or Purchaser, or both, stating the identity of the party to whom the Earnest Money is to be disbursed, Escrow Agent shall disburse such Earnest Money pursuant to such notice; provided, however, that if such notice is given by either Seller or Purchaser but not both, Escrow Agent shall notify the other party in writing of such notice and shall withhold disbursement of the Earnest Money for a period of fifteen (15) calendar days after giving such notice and if Escrow Agent receives written



Notice from either Seller or Purchaser within such fifteen (15) day period, which notice countermands or disputes the earlier notice of disbursement, then Escrow Agent shall withhold such disbursement until both Seller and Purchaser can agree upon a disbursement of the Earnest Money. Notwithstanding the foregoing, if Purchaser notifies Escrow Agent on or before the expiration of the Inspection Period of its election to terminate this Agreement pursuant to Paragraph 5(B), then no confirming notice from Seller shall be required by Escrow Agent, and Escrow Agent shall promptly disburse the Earnest Money as provided in Paragraph 5(B), without requesting or waiting for confirming notice from Seller. Seller and Purchaser agree to send to the other a duplicate copy of any written notice sent to Escrow Agent requesting disbursement or countermanding or disputing a request for disbursement.

A.    Limited Liability. In performing any of its duties hereunder, Escrow Agent shall not incur any liability to anyone for any damages, losses or expenses, except for any negligence, willful misconduct or breach of trust by Escrow Agent under this Agreement, and, accordingly, Escrow Agent shall not incur any such liability with respect to the following: (a) any action taken or omitted in good faith upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of Escrow Agent under this Agreement; or (b) any action taken or omitted in reliance on any instrument, including any written notice or instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

B.    Disputes. Notwithstanding anything in this Agreement to the contrary, upon a dispute between Seller and Purchaser sufficient in the sole discretion of Escrow Agent to justify its doing so, or if Escrow Agent has not disbursed the Earnest Money on or before the thirtieth day (30th) day following the Closing Date specified in Paragraph 6(A) (as the same may be extended as provided herein or by agreement of Purchaser and Seller), then Escrow Agent shall be entitled to tender into the registry or custody of any court of competent jurisdiction the Earnest Money, together with such pleadings as it may deem appropriate, and thereupon be discharged from all further duties and liabilities under this Agreement (other than with respect to any liabilities for negligence, willful misconduct or breach of trust by Escrow Agent).

C.    Indemnity. Seller and Purchaser indemnify Escrow Agent against, and hold Escrow Agent harmless from, any and all claims, actions, demands, losses, damages, expenses (including, without limitation, court costs, attorneys' fees and accountant's fees) and liabilities that may be imposed upon performance of its duties under this Paragraph 14, including, without limitation, any litigation arising from this Agreement or involving the subject matter of this Agreement, but excluding any such claims, actions, demands, losses, damages, expenses and liabilities resulting from or arising out of any negligence, willful misconduct or breach of trust by Escrow Agent under this Agreement. If there is any litigation arising from this Agreement or involving the subject matter hereof, and if Seller and Purchaser are opposing parties in such litigation, then the party prevailing in such litigation shall be reimbursed promptly upon demand by the other such party in an amount equal to that amount which the prevailing party shall have paid Escrow Agent with respect to such litigation and its subject matter pursuant to the indemnification agreement contained in this Paragraph 14(D). The provisions of this Paragraph 14(D) shall survive the Closing or any termination, cancellation or rescission of this Agreement.

15.    PROPERTY SOLD "AS IS".

All of the Property shall be purchased by Purchaser "AS IS, WITH ALL FAULTS", except as otherwise expressly provided for herein; and Seller makes no warranties or representations, express or implied, with respect to the quality or conditions thereof, merchantability or fitness for any use or purpose or compliance with law, except as otherwise specifically provided herein.



16.    LIENS AND ENCUMBRANCES.

Purchaser shall have no authority, expressed or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon or in any manner, to bind the interest of Seller in the Property or to charge the proceeds payable hereunder for any claim in favor of any person dealing with Purchaser, including those who may furnish materials or perform labor for any construction or repairs, and any such liens shall be attached to, if at all, only the Purchaser's interest, if any, granted the Purchaser by this instrument. Purchaser covenants and agrees that it will pay or cause to be paid all sums legally due and payable by or on account of any labor performed or materials furnished in connection with any work performed on the Property on which any lien is or can be validly or legally asserted against its interest, if any, in the Property with improvements thereon and that it will save and hold Seller harmless of any and all loss, costs or expense, based upon or arising out of asserted claims or liens against the Purchaser's estate, if any, or against the right, title or interest of the Seller in the Property under the terms of this Agreement, except for indemnities which by the express written terms of this Agreement are to survive the termination or cancellation of this Agreement. This Paragraph shall survive any termination or cancellation of this Agreement.

17.    LIKE-KIND EXCHANGES.

Each party acknowledges and agrees that the other may engage in an exchange of likekind property, using a qualified intermediary, pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, in connection with its disposition of the Property. Each party agrees to cooperate with any such like-kind exchange; provided (i) such party shall not be required to execute any instrument that increases such party's obligations or decrease its rights under this Agreement, (ii) such party shall not be required to incur any liability, cost or expense, and (iii) such party shall not be required to take title to any other property. Such party agrees to consent to the other party's assignment of this Agreement to a qualified intermediary in order to facilitate such like-kind exchange so long as such assignment does not adversely affect such party's rights hereunder, and such party agrees that it will have no recourse whatsoever against any qualified intermediary to whom this Agreement is assigned; provided the other party's assignment of this Agreement to a qualified intermediary shall not result in the other party being released from its obligations and liabilities hereunder.

18.    MISCELLANEOUS.

A.    Termination. In the event this Agreement is terminated pursuant to the terms hereof or otherwise, the terminating party shall give notice thereof to the other party and this Agreement shall be null and void and of no force or effect and the parties shall have no rights, obligations or liabilities hereunder, except those which expressly survive the termination of this Agreement.

B.    Waiver. The failure of any party to exercise any right given hereunder or to insist upon strict compliance with any term, condition or covenant specified herein shall not constitute



a waiver of such party's right to exercise such right or to demand strict compliance with any such term, condition or covenant under this Agreement.

C.  Entire Agreement. This Agreement contains the sole and entire agreement of the Seller and the Purchaser with respect to the transaction contemplated hereunder and no representation, inducement, promise or agreement, parole or written, between the Purchaser and the Seller and not incorporated herein shall be of any force or effect. Any previous agreement between the Seller and the Purchaser regarding the purchase of the Property shall be deemed null and void. Any amendment to this Agreement shall be in writing and executed by the Purchaser and the Seller.

D.  Successors and Assigns. The provisions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and the respective successors, successors in title and permitted assigns. Purchaser may freely assign this Agreement to any entity in which Purchaser (or any affiliate of Purchaser) retains or exercises managerial control without the prior written consent of Seller.

E.  Intentionally Omitted.

F.  Survival of Provisions. The provisions of this Agreement shall not merge into the documentation from this transaction but shall survive the Closing of this transaction and the execution and delivery of the limited warranty deed pursuant hereto.

G.  Applicable Law. This Agreement and all amendments hereto shall be governed by and construed under the laws of the State of South Carolina.

H.  Severability. If any term, covenant or condition of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, such provision, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall be deemed severable, and the remainder hereof shall not be affected thereby, and each term, covenant, or condition of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

I.  Date of this Agreement. In the event that any date or deadline set forth in this Agreement occurs on a Saturday, Sunday or legal holiday, such date or deadline shall automatically be extended to the next date which is not a Saturday, Sunday or legal holiday. The date of "final execution" and the "Effective Date" of this Agreement shall be the date of the last signature of Purchaser and Seller to this Agreement.

J.  Possession. Full and complete possession of the Property shall be delivered to Purchaser at Closing.

K. Counterparts. This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed, under seal, as of the day and year indicated opposite their names below.

| | SELLER: |
|---|---|
| | Equity Acquisitions-Trademark, LLC, a South Carolina limited liability company |
| 12-7-16 | By: Richard C. Davis |
| Date of Execution | Name: _____ Title: |
| | PURCHASER: |
| | CEDAR GROVE SC III, LLC, a DE LLC |
| 12/7/16 | By: AAron Gorin |
| Date of Execution | Name: _____ Title: |

Page 16 of 18

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed, under seal, as of the day and year indicated opposite their names below.

CONSENTED TO FOR THE PURPOSE
OF SERVING AS ESCROW AGENT:

**MADISON TITLE AGENCY**

_____

By:____

_____          Name:_____
                                 Title: _____

**EXHIBIT "A"**
**LEGAL DESCRIPTION OF XXX PROPERTY**



*Page 17 of 18*



**EXHIBIT "B"**
**LIST OF DUE DILIGENCE ITEMS TO BE PROVIDED BY SELLER**

Seller shall provide the following materials to Purchaser, by **electronic delivery**, pursuant to Sections 5A and 5B of the Agreement, to the extent in Seller's or Seller's property manager's actual possession:

12 month budget
12 month statement for cash 2014
12 month statement for cash 2015
12 month statement for cash 2016
Utility Bills for calendar year 2016, 2015 by month
Monthly Occupancy History for 2015 and 2016
Bank Statements monthly for 2015 and 2016
Business license
Service contracts
Rent Roll- current, and by month for the trailing 12 months
5 year Capital Expenditure history

Environmental report
Property Condition report
Survey
Final title proforma loan policy (combined)
5 year income statement
5 year property status report

# EXHIBIT F

# MADISON TITLE AGENCY VERIFICATION
# DEFENDANTS FAILED TO PAY EARNEST MONEY

See attached.

Cobb Dill & Hammett LLC
ATTORNEYS AT LAW

Hal Cobb <hcobb@cdhlawfirm.com>

## Question regarding contract

**Wosner, Hindy** <HWosner@madisontitle.com>
To: "Hal E. Cobb, Esq." <hcobb@cdhlawfirm.com>

Tue, Jan 17, 2017 at 2:24 PM

As discussed, I do not show an open order for this transaction. Please let me know if I can assist you with anything else.


Thank you,


Hindy Wosner
*Senior Title Officer*
MADISON TITLE AGENCY, LLC
*a Madison Commercial Real Estate company*

(732) 333-2737 - Direct


**From:** Hal E. Cobb, Esq. [mailto:hcobb@cdhlawfirm.com]
**Sent:** Tuesday, January 17, 2017 2:20 PM
**To:** Wosner, Hindy
**Subject:** Question regarding contract

[Quoted text hidden]
Notice to Recipients: This email and attached files (if any) contain privileged and confidential information intended solely for use by the sender and addressee(s). If you receive this transmission in error please notify the sender immediately and remove the email from your system. Unauthorized use of this information is strictly prohibited.

🔖 **contract EQA[2].pdf**
    1322K

# EXHIBIT G

# DEFENDANT GORIN EMAIL
# (January 25, 2017 at 12:05AM)

See attached.

Cobb Dill & Hammett LLC.
ATTORNEYS AT LAW

Zac Smith <zsmith@cdhlawfirm.com>

## Fwd: Residences at Haywood

4 messages

**Aaron Gorin** <aarongorin@gmail.com>                                    Wed, Jan 25, 2017 at 12:05 AM
To: hcobb@cdhlawfirm.com, ZSMITH@cdhlawfirm.com
Cc: Paul Marley <Paul.Marley@cushwake.com>

Dear Hal and Zach

Please see below. I did notify Mr. Marley, acting as broker and engaging with the Seller, that I did not intend to perform
further on the contract and that all my obligations ceased during my study period. I'm sure you have already seen the
contract which clearly states that I may terminate for any reason whatsoever during the study period, which had not
yet expired by the date of this email.

I did terminate within my rights of the contract, and there is nothing further to discuss here from my end of things.

Best,

Aaron

---------- Forwarded message ----------
From: **Aaron Gorin** <aarongorin@gmail.com>
Date: Wed, Jan 11, 2017 at 12:37 PM
Subject: Residences at Haywood
To: Paul Marley <Paul.Marley@cushwake.com>

1/11/17

Mr. Marley,

Let this email serve as notice that in reference to said purchase and sale agreement signed November 30, 2016
between Equity Acquisitions-Trademark LLC and Cedar Grove SC III LLC, buyer wishes to exercise its rights under
paragraph 5b of the contract to not extend its inspection period and receive a full refund of its Earnest Money from the
Title Company. Buyer hereby drops all rights and remedies under the Contract and does not proceed henceforth.

Best,

Aaron Gorin

**Hal E. Cobb, Esq.** <hcobb@cdhlawfirm.com>                              Wed, Jan 25, 2017 at 6:23 AM
To: Aaron Gorin <aarongorin@gmail.com>, ZSMITH@cdhlawfirm.com
Cc: Paul Marley <Paul.Marley@cushwake.com>, Richard Davis <richardtrademark@gmail.com>, Ginger A Davis
<gingertrademark@gmail.com>

No notice was provided within the timeline of the contract to the Seller. Further, we have discovered no security
deposit was put in place with escrow agent as required upon execution of the contract.

We will be bringing suit on behalf of the seller against the broker and the buyer should this transaction not close on January 27th as required per the terms of the contract for fraud and specific performance and any other appropriate cause of action.


Hal E. Cobb, Esq.

Admitted in South Carolina and Colorado
Cobb Dill & Hammett, LLC
300 W. Coleman Boulevard, Suite 106
Mt. Pleasant, S.C. 29464
843.327.5777 office
843.353.2583 fax


DISCLAIMER:
The information transmitted is intended only for the person or entity to which it
is addressed and may contain confidential and/or legally privileged material.
Any review, retransmission, dissemination or other use of this information, directly
or indirectly, by persons or entities other than the intended recipient is prohibited. If
you are not the intended recipient please contact the sender and delete the material
from all computers in which it resides. Internet communications cannot be
guaranteed to be secure or error-free as information could be intercepted, corrupted,
lost, destroyed, arrive late, incomplete, or contain viruses. Therefore, we do not
accept responsibility for any errors or omissions that are present in this message, or
any attachments, that have arisen as a result of e-mail transmission. If verification
is required, please request a hard-copy version or contact us by phone.
Any views or opinions presented are solely those of the author and do
not necessarily represent those of the firm.


CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we
inform you that, unless otherwise expressly indicated, any tax advice contained in
this communication (including any attachments or enclosures) is not intended or
written to be used, and cannot be used, for the purpose of (i)avoiding penalties that
may be imposed under the Internal Revenue Code or any other applicable tax law,
or (ii) promoting, marketing or recommending to another party any entity, investment,
plan, transaction, arrangement, or other tax related matter.

---

**From:** Aaron Gorin <aarongorin@gmail.com>
**Date:** Wednesday, January 25, 2017 at 12:05 AM

**To:** <hcobb@cdhlawfirm.com>, <ZSMITH@cdhlawfirm.com>
**Cc:** Paul Marley <Paul.Marley@cushwake.com>
**Subject:** Fwd: Residences at Haywood

[Quoted text hidden]

---

**Aaron Gorin** <aarongorin@gmail.com>                                    Wed, Jan 25, 2017 at 8:53 AM
To: "Hal E. Cobb, Esq." <hcobb@cdhlawfirm.com>
Cc: ZSMITH@cdhlawfirm.com, Paul Marley <Paul.Marley@cushwake.com>, Richard Davis
<richardtrademark@gmail.com>, Ginger A Davis <gingertrademark@gmail.com>

Me emailing the broker ahead of the deadline constitutes notice. End of story. If that message wasn't relayed to seller you can take it up with Cushman. I never have direct contact with the seller in any transaction, that is the role of the broker.

Further, the lack of money wired into escrow cancels the contract from that point. So, after day 5, there was no contract anymore.

There is no remedy in the contract for lack of performance and no penalties therein. You can do whatever you want, waste your time and money, but you will not be recovering anything from me.

Aaron

[Quoted text hidden]

---

**Hal E. Cobb, Esq.** <hcobb@cdhlawfirm.com>                              Thu, Jan 26, 2017 at 10:55 AM
To: Zac Smith <zsmith@cdhlawfirm.com>

Make sure you keep this email thread on this case.

Thanks,

Hal

Hal E. Cobb, Esq.

Admitted in South Carolina and Colorado
Cobb Dill & Hammett, LLC
300 W. Coleman Boulevard, Suite 106
Mt. Pleasant, S.C. 29464
843.327.5777 office
843.353.2583 fax

DISCLAIMER:
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or legally privileged material. Any review, retransmission, dissemination or other use of this information, directly or indirectly, by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient please contact the sender and delete the material from all computers in which it resides. Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late, incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachments, that have arisen as a result of e-mail transmission. If verification is required, please request a hard-copy version or contact us by phone. Any views or opinions presented are solely those of the author and do not necessarily represent those of the firm.

CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we inform you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments or enclosures) is not intended or written to be used, and cannot be used, for the purpose of (i)avoiding penalties that may be imposed under the Internal Revenue Code or any other applicable tax law, or (ii) promoting, marketing or recommending to another party any entity, investment, plan, transaction, arrangement, or other tax related matter.

**From:** Aaron Gorin <aarongorin@gmail.com>
**Date:** Wednesday, January 25, 2017 at 8:53 AM
**To:** "Hal E. Cobb, Esq." <hcobb@cdhlawfirm.com>
**Cc:** <ZSMITH@cdhlawfirm.com>, Paul Marley <Paul.Marley@cushwake.com>, Richard Davis <richardtrademark@gmail.com>, Ginger A Davis <gingertrademark@gmail.com>
**Subject:** Re: Residences at Haywood

[Quoted text hidden]

# EXHIBIT H

## DEFENDANT GORIN EMAIL
## (January 25, 2017 at 8:53AM)

See attached.

Cobb Dill & Hammett LLC
ATTORNEYS AT LAW

*for Smith <zsmith@cdhlawfirm.com>*

---

## Fwd: Residences at Haywood

---

**Aaron Gorin** <aarongorin@gmail.com>                                    Wed, Jan 25, 2017 at 8:53 AM
To: "Hal E. Cobb, Esq." <hcobb@cdhlawfirm.com>
Cc: ZSMITH@cdhlawfirm.com, Paul Marley <Paul.Marley@cushwake.com>, Richard Davis
<richardtrademark@gmail.com>, Ginger A Davis <gingertrademark@gmail.com>

Me emailing the broker ahead of the deadline constitutes notice. End of story. If that message wasn't relayed to seller you can take it up with Cushman. I never have direct contact with the seller in any transaction, that is the role of the broker.

Further, the lack of money wired into escrow cancels the contract from that point. So, after day 5, there was no contract anymore.

There is no remedy in the contract for lack of performance and no penalties therein. You can do whatever you want, waste your time and money, but you will not be recovering anything from me.

Aaron

On Wed, Jan 25, 2017 at 6:23 AM, Hal E. Cobb, Esq. <hcobb@cdhlawfirm.com> wrote:

> No notice was provided within the timeline of the contract to the Seller. Further, we have discovered no security deposit was put in place with escrow agent as required upon execution of the contract.
>
> We will be bringing suit on behalf of the seller against the broker and the buyer should this transaction not close on January 27th as required per the terms of the contract for fraud and specific performance and any other appropriate cause of action.
>
> Hal E. Cobb, Esq.
>
> Admitted in South Carolina and Colorado
> Cobb Dill & Hammett, LLC
> 300 W. Coleman Boulevard, Suite 106
> Mt. Pleasant, S.C. 29464
> 843.327.5777 office
> 843.353.2583 fax
>
> DISCLAIMER:
> The information transmitted is intended only for the person or entity to which it
> is addressed and may contain confidential and/or legally privileged material.

Any review, retransmission, dissemination or other use of this information, directly or indirectly, by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient please contact the sender and delete the material from all computers in which it resides. Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late, incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachments, that have arisen as a result of e-mail transmission. If verification is required, please request a hard-copy version or contact us by phone.
Any views or opinions presented are solely those of the author and do not necessarily represent those of the firm.


CIRCULAR 230 DISCLOSURE: To comply with Treasury Department regulations, we inform you that, unless otherwise expressly indicated, any tax advice contained in this communication (including any attachments or enclosures) is not intended or written to be used, and cannot be used, for the purpose of (i)avoiding penalties that may be imposed under the Internal Revenue Code or any other applicable tax law, or (ii) promoting, marketing or recommending to another party any entity, investment, plan, transaction, arrangement, or other tax related matter.

---

**From:** Aaron Gorin <aarongorin@gmail.com>
**Date:** Wednesday, January 25, 2017 at 12:05 AM
**To:** <hcobb@cdhlawfirm.com>, <ZSMITH@cdhlawfirm.com>
**Cc:** Paul Marley <Paul.Marley@cushwake.com>
**Subject:** Fwd: Residences at Haywood


Dear Hal and Zach


Please see below. I did notify Mr. Marley, acting as broker and engaging with the Seller, that I did not intend to perform further on the contract and that all my obligations ceased during my study period. I'm sure you have already seen the contract which clearly states that I may terminate for any reason whatsoever during the study period, which had not yet expired by the date of this email.


I did terminate within my rights of the contract, and there is nothing further to discuss here from my end of things.


Best,


Aaron

---------- Forwarded message ----------
From: **Aaron Gorin** <aarongorin@gmail.com>
Date: Wed, Jan 11, 2017 at 12:37 PM
Subject: Residences at Haywood
To: Paul Marley <Paul.Marley@cushwake.com>

1/11/17

Mr. Marley,

Let this email serve as notice that in reference to said purchase and sale agreement signed November 30, 2016 between Equity Acquisitions-Trademark LLC and Cedar Grove SC III LLC, buyer wishes to exercise its rights under paragraph 5b of the contract to not extend its inspection period and receive a full refund of its Earnest Money from the Title Company. Buyer hereby drops all rights and remedies under the Contract and does not proceed henceforth.

Best,

Aaron Gorin